UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| PHILLIP HALE, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | NO. 3:18-cv-00672 |
| | ) | CHIEF JUDGE CRENSHAW |
| WARDEN MAYES, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Phillip Hale, an inmate at the Riverbend Maximum Security Institute ("RMSI") in Nashville, Tennessee, filed this *pro se* civil rights action under 42 U.S.C. § 1983 against Warden Mayes [F/N/U] and Unit Manager Davis [F/N/U]. (Doc. No. 1.) Plaintiff also filed an application to proceed in this Court without prepaying fees and costs (Doc. No. 2), and motions to suspend a defendant (Doc. No. 4), hold a trial (Doc. No. 5), and suspend other inmates (Doc. No. 6).

**I.     Proper Plaintiffs**

As an initial matter, the Court must determine the proper number of plaintiffs in this action. Johnny Lowery, Phillip Hale's fellow inmate at RMSI, is included as a second plaintiff on the list of parties on the complaint form. (Doc. No. 1 at 1.) But the allegations in the body of the complaint do not specifically concern Lowery, and Lowery did not sign the complaint. (Id. at 5–16); see Fed. R. Civ. P. 11(a) ("Every pleading . . . must be signed . . . by a party personally if the party is unrepresented.") The Court also notes that Hale submitted an application to proceed *in forma pauperis* (Doc. No. 2), but Lowery did not.

Although Lowery filed a two-page notice with the Court about one month after the Court received the complaint in this action, the notice is not sufficient for the Court to permit Lowery to

join this action as a plaintiff. See Herndon v. Heyns, 702 F. App'x 325, 328 (6th Cir. 2017) (applying Fed. R. Civ. P. 20) (listing reasons to deny a *pro se* prisoner's request for another prisoner to join as a second plaintiff as including "difficulties coordinating between the plaintiffs, who each must sign every pleading; the transitory nature of the prison population; the individualized questions of fact and law that underlie principles of exhaustion for each plaintiff; issues with the payment of filing fees; and complications arising from *in forma pauperis* status"). Accordingly, the Court does not consider Lowery to be a plaintiff, and the Clerk will be directed to update the docket to reflect that Phillip Hale is the only plaintiff in this action.

## II. Application to Proceed as a Pauper

The Court may authorize a prisoner to file a civil suit without prepaying the filing fee. 28 U.S.C. § 1915(a). Because it appears from Plaintiff Phillip Hale's *in forma pauperis* application (Doc. No. 2) and related materials (Doc. No. 9) that he lacks sufficient financial resources from which to pay the full filing fee in advance, his application (Doc. No. 2) will be granted. Plaintiff is nonetheless responsible for the $350.00 filing fee, so the fee will be assessed as directed in the accompanying Order. 28 U.S.C. § 1915(b)(1).

## III. Initial Review

Under the screening requirements of the Prison Litigation Reform Act ("PLRA"), the Court must conduct an initial review and dismiss the complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. §§ 1915A, 1915(e)(2)(B); 42 U.S.C. § 1997e(c)(1). The Court must also construe a *pro se* complaint liberally, United States v. Smotherman, 838 F.3d 736, 739 (6th Cir. 2016) (citing Erickson v. Pardus, 551 U.S. 89, 94 (2007)), and accept the plaintiff's

factual allegations as true unless they are entirely without credibility. See Thomas v. Eby, 481 F.3d 434, 437 (6th Cir. 2007) (citing Denton v. Hernandez, 504 U.S. 25, 33 (1992)).

### A. Factual Allegations

Plaintiff alleges that, on or around June 23, 2017, he arrived to Riverbend Maximum Security Institute and was assigned to a "super max" cell covered with grime and mold. (Doc. No. 1 at 7.) He alleges that, based on his classification status and disciplinary history, he should not have been assigned to this cell. (Id.) On July 3 and 5, 2017, Plaintiff alleges that he was reassigned to cells that were extremely dirty, and that he was denied cleaning supplies. (Id.) He alleges that one of these reassignments was based on the false assumption that he was part of a "white supremacy group." (Id.) Plaintiff did not receive all of his personal items during this time period, and was denied recreation for some of the time. (Id. at 7–8.) On July 25, 2017, Plaintiff alleges that his cell was "repeatedly searched," and he asked to be reassigned to a new cell because the bunk was torn off of the wall. (Id. at 8.) Sergeant ("Sgt.") Robins told Plaintiff that RMSI staff would consider granting Plaintiff's request if he went 60 days "without a write up." (Id.) On three occasions, Plaintiff alleges, Unit Manager Davis threatened him with pepper spray for "non violent issues." (Id. at 5.)

On "several" occasions, Unit Manager Davis, Sgt. Robinson, Corporal ("Cpl.") Willis, Cpl. Grossbeck, and Correctional Officer ("CO") Stanfield assigned Plaintiff to "lock down" without a disciplinary report, denying him cleaning supplies, shower privileges, clean clothes, and recreation. (Id. at 5, 8.) Plaintiff also alleges that COs Lablanc, Gerth, Labarin, and Barber enforced these assignments. (Id. at 5.)

On August 15, 2017, Plaintiff alleges that he had "bumps" that appeared infected, and Unit Manager Davis placed him in lock down after tests confirmed that he had a "mersa" infection. (Id.

3

at 8.) Since that time, "mersa" has "broken out 3 to 4 times." (Id. at 11.) For five days after he was released from lock down, Plaintiff was denied cleaning supplies, shower facilities, and recreation. (Id. at 8.) Around September 16, 2017, after Cpl. Grossbeck had been flirting with another inmate named Paul, Plaintiff alleges that he had an "incident" with Grossbeck. (Id. at 9.) Paul then spoke to CO Lablanc, and Lablanc later instructed Plaintiff to keep his clothes on while he cleaned the shower with the water running. (Id.) Plaintiff refused and was instructed to go to his cell. (Id.) CO Lablanc issued Plaintiff a "write up" for not cleaning the shower. (Id.)

On September 17, 2017, Plaintiff alleges that Paul attacked him while eating, and then Plaintiff was placed in "solitary" for two days. (Id. at 8–9.) When he got out, Plaintiff did not have a job for "around 6 months." (Id. at 9.) During that time, CO Stanfield and Unit Manager Davis harassed Plaintiff by telling the warden he was violent and denying him work detail. (Id. at 10.)

Plaintiff alleges he was given the wrong mental health medications on two or more occasions, causing him to act irrationally, experience mental stress, and have suicidal thoughts. (Id. at 5, 7, 10–11.) On December 20, 2017, Nurse Vera brought Plaintiff the incorrect amount of medication, and failed to rectify it that night. (Id. at 10.) On December 27, 2017, Plaintiff was again placed in lock down for about twenty days, during which he was denied recreation and hot water. (Id. at 11.) Plaintiff was then reassigned to a dirty cell and refused cleaning supplies. (Id. at 11–12.) Inmate Paul attacked Plaintiff again during this time. (Id. at 12.)

On April 15, 2018, an alleged gang member "jumped" Plaintiff, and Unit Manager Davis put Plaintiff on lock down. (Id. at 12.) During this time, Plaintiff did not have access to hygiene supplies, recreation, or religious materials. (Id.) He received his property back on April 19, but some "logs" for legal matters were missing, and some religious materials were torn. (Id.) Plaintiff reported these matters to CO Lablanc and Sgt. Robins, but they did not rectify them. (Id.)

4

On May 6, 2018, Nurse Ozho gave Plaintiff the incorrect medication, but insisted it was correct after Plaintiff complained. (Id. at 10–11.) A sergeant and a corporal came to Plaintiff's cell about an hour later and told Plaintiff that he was correct about the medication. (Id. at 11.) Head Nurse Josh then brought Plaintiff the correct dosage. (Id.)

At some point, Plaintiff was placed on a religious diet, but he did not get desert on "sev[e]ral occasion[s]" and received a small amount of food on "more than 2 occasions." (Id. at 13.) Cpl. Burleson refused to give Plaintiff an apple and a milk. (Id.)

On June 14, 2018, while he was distributing breakfast, CO Tuck used coarse language and told Plaintiff that he was not Jewish, despite Plaintiff receiving a Jewish religious diet. (Id. at 15.) CO Tuck eventually gave Plaintiff a milk and snarled at Plaintiff while saying "here Jew." (Id.) Plaintiff reported this to Sgt. Robins, and Robins refused to address the matter. (Id. at 15–16.) Plaintiff alleges that prison staff and fellow inmates made fun of him following this incident. (Id. at 16.) Plaintiff also alleges that prison staff denied his "religious rights" by refusing him religious ceremonies, the right to speak with a rabbi, and altering religious meals. (Doc. No. 8 at 1–2.)

On June 30, 2018, while administering medication to inmates, Nurse Ozho gave Plaintiff a water cup with a hole in it. (Doc. No. 1 at 13.) Plaintiff "tossed out the cup" and received a write up. (Id.) On July 4, Nurse Ozoh placed Plaintiff's medication in a cup filled with dirty water. (Id.) On July 12, Plaintiff was ordered to remain silent during a search, threatened with reassignment to "super max" and a taser, and lost access to his property for one night. (Id.)

On July 27, 2018, as Plaintiff was distributing breakfast trays to inmates, an unidentified correctional officer failed to open flaps for inmates to receive the food. (Doc. No. 7 at 1.) When Plaintiff asked him to open the flaps, the officer refused in unintelligible speech. (Id.) Plaintiff asked another officer to finish opening the flaps, and that officer told Plaintiff to return to his cell.

5

(Id. at 1–2.) Plaintiff explained the situation to Sgt. Robins and Unit Manager Davis, but Unit Manager Davis threatened Plaintiff with pepper spray, accused him of passing contraband, and placed him on lock down. (Id. at 2.)

On August 6, 2018, Unit Manager Davis told Plaintiff he would remove everything from Plaintiff's cell because Plaintiff was "filing PREA on him." (Doc. No. 8 at 6.) Plaintiff also submitted a daily log of complaints regarding his meals in July and August 2018, including that he was denied bread, certain drinks, and seasonings. (Id. at 8–9.)

Plaintiff alleges that prison staff interfered with his grievances by denying them, refusing to process them, or providing "bogus responses." (Doc. No. 1 at 5, 14, 16.) He asserts that distributing medication at inmates' cells violates their confidentiality. (Id. at 16.) He requests monetary damages and the suspension of all prison staff referred to in the complaint. (Id. at 14.)

### B. Standard of Review

To determine whether a prisoner's complaint "fails to state a claim on which relief may be granted" under the PLRA, the Court applies the same standard as under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Hill v. Lappin, 630 F.3d 468, 470–71 (6th Cir. 2010). The Court therefore accepts "all well-pleaded allegations in the complaint as true, [and] 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" Williams v. Curtin, 631 F.3d 380, 383 (6th Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009)). An assumption of truth does not, however, extend to allegations that consist of legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). A *pro se* pleading must be liberally construed and "held to less stringent standards than formal pleadings drafted by lawyers." Erickson, 551 U.S. at 94 (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

6

## C. Discussion

"To prevail on a cause of action under § 1983, a plaintiff must prove '(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law.'" Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009) (quoting Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006)).

### 1. Dismissal of Warden Mayes

Plaintiff names Warden Mayes and Unit Manager Davis as defendants in the caption of the complaint. (Doc. No. 1 at 1.) In the body of the complaint, however, he does not make any specific allegations against Warden Mayes. To the extent that Plaintiff seeks to hold Mayes liable under Section 1983 based on his capacity as a supervisor at RMSI, Plaintiff fails to state a claim. It is well-settled that "Section 1983 liability must be premised on more than mere respondeat superior, the right to control one's employees." Everson v. Leis, 556 F.3d 484, 496 (6th Cir. 2009) (citing Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)). A claim against a supervisor "must fail . . . unless 'the supervisor encouraged [a] specific incident of misconduct or in some other way directly participated in it.'" Cardinal v. Metrish, 564 F.3d 794, 802–03 (6th Cir. 2009) (quoting Combs v. Wilkinson, 315 F.3d 548, 558 (6th Cir. 2002)). Here, because Plaintiff does not allege that Warden Mayes personally participated in any unconstitutional conduct, Mayes will be dismissed as a party.

### 2. Dismissal of Due Process Claim

Plaintiff repeatedly complains that Davis and other RMSI staff members improperly assigned him to "lock down" or other cells with restrictive conditions. "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Wilkinson v. Austin, 545 U.S. 209, 221–22 (2005) (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)). "In order to determine whether segregation of an inmate from the general

7

prison population involves the deprivation of a state-created liberty interest protected by the due process clause, courts are to determine if the segregation imposes an 'atypical and significant' hardship on the inmate 'in relation to the ordinary incidents of prison life.'" Jones v. Baker, 155 F.3d 810, 812 (6th Cir. 1998) (quoting Sandin v. Conner, 515 U.S. 472, 483 (1995)). In making this determination, the Court considers "the nature and duration of an inmate's segregation," as well as "whether the segregation will affect the overall duration of the inmate's sentence." Harden-Bey v. Rutter, 524 F.3d 789, 795 (6th Cir. 2008).

While Plaintiff alleges that he experienced certain temporary restrictions—on access to his property, recreation time, shower facilities, clean clothes, and cleaning supplies—these restrictions do not implicate a protected liberty interest. Plaintiff does not allege how long some of his stints in lock down lasted. On other occasions, however, Plaintiff alleges he was placed on "lock down" for two days, five days, and twenty days. (Doc. No. 1 at 7–8 (five days), id. at 9 (two days), id. at 11 (twenty days).) These relatively brief durations in confinement, and the nature of the alleged restrictions, do not support a finding that Plaintiff's assignments in "lock down" imposed hardships that are "'atypical and significant' . . . 'in relation to the ordinary incidents of prison life.'" Jones, 155 F.3d at 812 (quoting Sandin, 515 U.S. at 483); see Jospeh v. Curtin, 410 F. App'x 865, 868 (6th Cir. 2010) (finding that a prisoner's alleged "61-day stay in administrative segregation" was not "atypical and significant"). Nor does Plaintiff allege that his confinement in lock down impacted the length of his sentence. Accordingly, Plaintiff fails to state a due process claim.

### 3. Conditions-of-Confinement Claim

Plaintiff also alleges that many of his cells were extremely dirty, and prison staff restricted his access to cleaning and hygiene supplies. The Eighth Amendment protects convicted inmates from the "unnecessary and wanton infliction of pain," Hope v. Pelzer, 536 U.S. 730, 737 (2002)

(citation omitted), which imposes a duty on prison officials to "provide humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832–33 (1994) (citations omitted). "An Eighth Amendment conditions of confinement claim [] contains both an objective and a subjective component." Richmond v. Settles, 450 F. App'x 448, 455 (6th Cir. 2011) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). "The objective component requires the plaintiff to demonstrate that he has been subjected to specific deprivations that are so serious that they deny him 'the minimal civilized measure of life's necessities.'" Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). "The subjective component requires the plaintiff to demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs." Id. (citing Farmer, 511 U.S. at 834).

Here, the Court first concludes that Plaintiff has satisfied the objective component of his conditions-of-confinement claim. It is true that Plaintiff's alleged restrictions to cleaning and hygiene supplies were largely temporary, and generally "[a]llegations of temporary inconveniences are insufficient to state a[n Eighth Amendment] claim." Powell v. Washington, 720 F. App'x 222, 228 (6th Cir. 2017) (citing Dellis v. Corr. Corp. of Am., 257 F.3d 508, 511 (6th Cir. 2001)). But Plaintiff also alleges that he contracted "mersa"[1] in July or August 2017 (Doc. No. 1 at 8), and that it has "broken out 3 to 4 times" since then. (Id. at 11.) While Plaintiff does not provide any details about the circumstances of how he allegedly contracted MRSA, the Court must read the complaint liberally. In doing so, the allegations reflect that Plaintiff may have contracted this serious infection due to unsanitary conditions at RMSI and the periodic restrictions on Plaintiff's access to cleaning and hygiene supplies. These restrictions also may have made it more

---

[1] The Court assumes that Plaintiff is referring to "MRSA, which is an antibiotic-resistant type of staph bacteria. MRSA is spread through person-to-person contact, so crowded living environments, such as prisons, are ideal environments for outbreaks." Wooler v. Hickman Cty., Ky., 377 F. App'x 502, 503 (6th Cir. 2010).

difficult for Plaintiff to avoid the alleged "3 to 4" break outs after contracted the infection. In short, the alleged unsanitary conditions combined with the alleged restrictions on cleaning and hygiene supplies may have led to Plaintiff's alleged MRSA diagnosis. See Wilson, 501 U.S. at 304 ("*Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .*"). For the purpose of initial review, the Court concludes that these deprivations may have been sufficiently serious to deny Plaintiff the minimal civilized measure of life's necessities.

Further, Plaintiff's allegations that he continually requested cleaning supplies and cell reassignments put Unit Manager Davis on notice that Plaintiff was experiencing these allegedly unsanitary conditions. His continued exposure to these conditions reflects that Unit Manager Davis ignored Plaintiff's complaints. See Taylor v. Larson, 505 F. App'x 475, 477 (6th Cir. 2012) (finding that prison officials satisfied the subjective component of this claim by ignoring a prisoner's complaints about allegedly inhumane conditions of confinement). The Court therefore concludes that Plaintiff has satisfied the subjective component of his conditions-of-confinement claim as to Unit Manager Davis, and this claim will not be dismissed at this juncture.

### 4. Dismissal of Remaining Claims

Plaintiff's remaining allegations fail to state a claim. He alleges that RMSI medical staff gave him incorrect mental health medication on several occasions, causing him to experience stress and have suicidal thoughts. An Eighth Amendment claim for denial of adequate medical care has objective and subjective components. Dominguez, 555 F.3d at 550 (quoting Farmer, 511 U.S. at 834). "The objective component requires a plaintiff to show the existence of a 'sufficiently serious' medical need." Id. (quoting Farmer, 511 U.S. at 834). And the Sixth Circuit has held that "a

10

prisoner's 'psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.'" Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir. 2001) (quoting Horn v. Madison Cty. Fiscal Ct., 22 F.3d 653, 660 (6th Cir. 1994)). But Plaintiff has not satisfied the subjective component of this claim, which requires prison officials to act with "deliberate indifference" by "'be[ing] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw[ing] the inference.'" Barnett v. Luttrell, 414 F. App'x 784, 788 (6th Cir. 2011) (quoting Blackmore v. Kalamazoo Cty., 390 F.3d 890, 895 (6th Cir. 2004)). Here, Plaintiff does not allege any facts reflecting that the disbursement of incorrect medication was "anything other than negligent," and so it "constituted medical malpractice at most," not deliberate indifference. See id. (citations omitted) (finding incorrect administration of medication insufficient to satisfy the subjective component of this claim).

Plaintiff also alleges that other RMSI inmates attacked him on three occasions. The Eighth Amendment protects a prisoner's right to be free "from violence at the hands of other prisoners." Bishop v. Hackel, 636 F.3d 757, 766 (6th Cir. 2011) (quoting Farmer, 511 U.S. at 833). To state a failure-to-protect claim, a plaintiff must allege that his conditions of confinement presented an objectively and substantially serious risk of harm, and that a prison official subjectively "kn[ew] of and disregard[ed]" that risk. Id. at 766–67 (quoting Farmer, 511 U.S. at 837). As with his claim for denial of adequate medical care, however, Plaintiff does not allege that any prison official had the subjective state of mind necessary to support a failure-to-protect claim. That is, Plaintiff's allegations do not reflect that the defendants were aware that Plaintiff faced any heightened risk of being attacked. Thus, Plaintiff fails to state a claim for failure to protect him from attacks by other RMSI inmates.

Next, Plaintiff alleges that he has experienced a variety of harassment and threats from RMSI staff, but these allegations do not rise to level of a constitutional violation. He alleges that Unit Manager Davis threatened him in various ways—either with pepper spray (Doc. No. 1 at 5; Doc. No. 7 at 2), by taking everything from his cell (Doc. No. 8 at 6), or in an unspecified manner (Doc. No. 4 at 1). He also alleges that Davis and other RMSI staff harassed him by telling the warden he was violent. (Doc. No. 1 at 10.) He alleges that a staff member used profanity and questioned the sincerity of his religious beliefs. (Id. at 15–16.) He alleges that medical staff members harassed him by giving him a water cup with a hole in it and giving him a cup filled with dirty water. (Id. at 13.) And he alleges that a staff member harassed him by ordering him to clean the shower while wearing his clothes. (Id. at 9.) If true, these allegations are inappropriate and unprofessional, but they do not state a claim for relief because such "harassment and verbal abuse . . . do not constitute the type of infliction of pain that the Eighth Amendment prohibits." Johnson v. Unknown Dellatifa, 357 F.3d 539, 546 (6th Cir. 2004) (citing Ivey v. Wilson, 832 F.2d 950, 954 (6th Cir. 1987)) (finding that the following allegations, if true, were "shameful and utterly unprofessional," but did not state an Eighth Amendment claim: "continuously bang[ing] and kick[ing a prisoner's] cell door, throw[ing] his food trays through the bottom slot of his cell door so hard that the top flies off, mak[ing] aggravating remarks to him, mak[ing] insulting remarks about his hair being too long, growl[ing] and snarl[ing] through his window, smear[ing] his window to prevent him from seeing out of it, behav[ing] in a racially prejudicial manner toward him and jerk[ing] and pull[ing] him unnecessarily hard when escorting him from his cell").

To the extent that Plaintiff is challenging the alleged deprivation of his personal property at various times during his confinement at RMSI, he also fails to state a claim. Even the "unauthorized, intentional deprivation of a prisoner's property does not give rise to a due process

12

claim if the state provides an adequate post-deprivation remedy." Weatherspoon v. Woods, No. 16-1277, 2017 WL 3923335, at *3 (6th Cir. Feb. 24, 2017) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984) and Parratt v. Taylor, 451 U.S. 527, 541 (1981)). Here, Plaintiff does not allege that he attempted to engage the state's post-deprivation remedy, or that it was inadequate. Likewise, Plaintiff does not state a claim related to prison staff searching his cell, as "[p]risoners have no reasonable expectation of privacy in their cells, Palmer, 468 U.S. at 525–26, 544 n.8, and the Fourth Amendment does not apply to searches and seizures in prison, id. at 529–30." Id.

Plaintiff offers a variety of complaints regarding his food, but these allegations fail to state a claim because they do not reflect that he failed to receive adequate nutrition or that his meals adversely affected his health. Richmond, 450 F. App'x at 456; see Cunningham v. Jones, 667 F.2d 565, 566 (6th Cir. 1982) (noting that "complaint[s] about the preparation or quality of prison food" are "far removed from Eighth Amendment concerns"). And Plaintiff's allegations regarding harassment based on his religion—denial of unspecified religious ceremonies, tampering with his religious diet in unspecified ways, and "deni[al of] the right to speak or have a rab[b]i visit [him]" (Doc. No. 8 at 1–2)—are simply too vague and conclusory to state a claim. See also Colvin v. Caruso, 605 F.3d 282, 291–92 (6th Cir. 2010) (citation omitted) (finding that a prisoner failed to state a claim where he did not demonstrate his inability to "practice Judaism privately, read Jewish literature, or correspond with other practitioners of the Jewish faith").

Finally, Plaintiff alleges that prison staff denied him work detail and improperly handled his grievances. (Doc. No. 1 at 5, 10, 14, 16.) But these allegations do not state a claim because prisoners do not have a constitutional right "to prison employment or a particular prison job," Davis v. Clinton, 74 F. App'x 452, 455 (6th Cir. 2003) (citing Newsom v. Norris, 888 F.2d 371, 374 (6th Cir. 1989)), or "to an effective prison grievance procedure," Hursey v. Anderson, 2017

13

WL 3528206, at *2 (6th Cir. Mar. 31, 2017) (citing Argue v. Hofmeyer, 80 F. App'x 427, 430 (6th Cir. 2003)). Plaintiff also alleges that medical staff violated inmates' confidentiality by distributing medication at their cells. (Doc. No. 1 at 16.) This allegation does not state a claim for at least two reasons: first, Plaintiff does not have standing to bring claims on behalf of other inmates, Dodson v. Wilkinson, 304 F. App'x 434, 438 (6th Cir. 2008) (citing Newsom, 888 F.2d at 381); and second, Plaintiff does not allege that distributing medication in this manner led to the "disclosure of sensitive medical information [to] other inmates," as required to implicate a prisoner's privacy interest. Moore v. Prevo, 379 F. App'x 425, 427–28 (6th Cir. 2010).

## IV.   Miscellaneous Motions

Plaintiff also filed a motion to suspend Unit Manager Davis for the duration of this lawsuit (Doc. No. 4), a motion for a "fast and speedy trial" (Doc. No. 5), and a motion to suspend other inmates (Doc. No. 6). These three motions are without merit. Plaintiff's first motion will be denied because the Court does not have authority to control the terms of a Unit Manager Davis's employment. See Theriot v. Woods, No. 2:09-cv-199, 2010 WL 623684, at *4 (W.D. Mich. Feb. 18, 2010) (holding that a prisoner's request for the Court to enter an order terminating the employment of state correctional employees is "entirely improper and is not available under 42 U.S.C. § 1983"). The Court construes Plaintiff's second motion as a demand for a jury trial, and this request is moot because Plaintiff already requested a jury trial in the complaint. (Doc. No. 1 at 1.) The Court notes, however, that this is a civil action, and both "[t]he Sixth Amendment right to a speedy trial" and "the Speedy Trial Act, 18 U.S.C. § 3161 et seq. appl[y] only to criminal prosecutions." United States v. Forty Thousand Dollars ($40,000.00) in U.S. Currency, 763 F. Supp. 1423, 1429 (S.D. Ohio 1991). As to Plaintiff's third motion, he has not provided any authority for the Court to suspend these inmates, and they are not parties to this action. Goodell v.

14

Anthony, 159 F. Supp. 2d 796, 801 (E.D. Mich. 2001) (collecting cases) ("[A]n inmate is not a state actor or a person acting under the color of state law for purposes of stating a claim under § 1983.").

## V.     Conclusion

For these reasons, the Clerk will be directed to update the docket to reflect that Phillip Hale is the only plaintiff in this action. Plaintiff's Eighth Amendment conditions-of-confinement claim against Unit Manager Davis will be referred to the Magistrate Judge for further proceedings consistent with the accompanying Order. All other claims and defendants will be dismissed, and Plaintiff's three miscellaneous motions (Doc. Nos. 4, 5 and 6) will be denied.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE